All right, our third case for this morning is Hollins v. Regency Corporation. Mr. Hanson. Good morning, Your Honors. My name is Adam Hanson. I represent the appellant, Venitia Hollins, and may it please the Court. There's a jurisdictional question in this case that I don't intend to address today unless the Court has questions. So I want to say something about that because it seems to me your approach to this proceeds on the assumption that simply writing a letter in a Fair Labor Standards Act case saying, I want to opt in, is enough to make you a party plaintiff. And, you know, Fair Labor Standards Act collective actions are neither fish nor fowl. They're not really Rule 23 class actions, and they're not individual A versus B lawsuits either. But the practice in these cases of conditional certification now is well established, and that step never happened in this case. So given that, and actually given the footnote that the district court drops, saying, well, since I'm getting rid of this, you know, on the individual claim, the requests, yeah, footnote two, the plaintiff's motion to conditionally certify a collective action is denied without prejudice is moved. I don't understand why that doesn't just take care of these not yet parties to the case and leave us with only Vanidia Hollins. Sure. Well, the premise that is the subject of my disagreement is that the opt-in plaintiffs are not parties until there's some sort of a conditional certification. But where do you have authority for that? It's the text of the FLSA as amended by the Portal to Portal Act, which says that to become a party plaintiff, you, there's two ingredients really. It's you sign the piece of paper, and then you submit the consent form essentially on file with the court. And the court certainly has the authority to put a standing order out there that says I'm not going to accept consents, you know, typically after a certain date or also before a certain date. But the accepted practice is once that consent is lodged with the court, that person is a party plaintiff. But what's the point of conditional certification? It seems to me somebody could send in a letter saying I'm opting in, and they might not properly be part of the group. They might be administrative employees, or they might be people who don't have to do work on the floor to take the facts of your case. And so the district court has some role. That's why I say conditional certification has evolved from the language that you cite. And so I'll just make that point. The other point that bothers me very much was your suggestion that you were just going to stipulate away the rights of these people who were indicating they wanted to opt in. But I can't tell who's their lawyer, what their interests are, and I'm very uncomfortable with taking that route. Sure. Let me address point one and then point two. So with respect to conditional certification, the Supreme Court said two terms ago in Genesis that the sole consequence of conditional certification is the sending of notice. And that's really where the procedure came from. It was a procedure to identify and then send notice to people who could be affected so they could decide whether or not to opt in. But certainly people opt into these cases all the time before receiving conditional certification notice. They might find out about the case via word of mouth. And to the second part of question one, to the extent, and of course it does happen, that someone opts into a case where they really don't belong, they're in the wrong employer category or something like that, district courts simply use the case management tools they have to kick that person out of the case. Well, I guess that is kind of my point. Anyway, I think there is something worth thinking about in terms of what the status of these people are. There's some literature about this, and I think at the moment probably the most useful thing for us to do is to focus on Ms. Hollins and let you make your merits argument for her. She certainly is here. She is here, and I'm happy to do so. If I'm right, she's here on a final judgment, and if she's not here on a final judgment, at least you can make your argument anyway. Fair enough. Well, turning to the merits, this case calls upon this court to examine the boundary between an employee under the Fair Labor Standards Act and a student who is not covered. And this court writes on a fairly clean slate, unlike, for example, the familiar independent contractor cases. There's no case from this circuit that directly answers this question. So do you think people who work at law school clinics are employees of the law school? A student is in the employment practices clinic under the supervision of a clinical professor and representing people in court. Maybe they're a third-year student. They've got practice rights. Certainly if the law school is receiving payment for the service, I think… The law school certainly could if it's a Title VII case and there's fee shifting. That's right. I think in that case, the person would be covered as an employee under the statute. Now, let me add a caveat, which is there are many examples of students, law students among them, who are essentially graduating into a professional role. And I don't mean professional. The cosmetologists here are certainly a kind of profession, but professional in that they would be professionally exempt under the Fair Labor Standards Act. So there's only a handful of cases that examine this, but essentially what they have said is when a law student is operating under a student practice rule, essentially they can take advantage of the professional exemption. So the answer to your question is I think that person could be considered an employee but would be exempt from the minimum wage requirement. But for this other thing. That's right. I mean, there are a tremendous number of lines of work, I'll say, to avoid the word profession, in which practical training is a very important part of the training. It seems to me what these people got from Regency was a one-stop shop, basically. They got their classroom training. They got the next step up. They had their performance floor. Once they were done, they were ready to be licensed and they could go out and work on their own. And so I don't know why the better way to look at it in light of these 400-factor decisions isn't that this is really training. They are paying tuition. They're paying out to get this valuable credential at the end of the day or to be in a position to test for it or whatever they do. I think that's right, but accepting that proposition doesn't answer the question. You have to look at the structure of the Fair Labor Standards Act. There are many jobs that require a course of clinical training, and Congress thought about this. And if you think about the ways that Congress could have come at this problem, there are essentially three options available. Option one is to say, okay, we're going to place this category of workers, whatever you want to call them, who are at the twilight essentially in the marketplace doing the work but still under a training regimen, completely outside the coverage of the FLSA. That poses problems because it opens the door to potential exploitation and a lack of oversight of employees. The other option on the other side that Congress didn't choose is it could have just said, we're going to make clear that these are full employees subject to full minimum wage requirements just like anybody else. That would be problematic for businesses because some of these workers aren't very valuable early on. Well, right. And the market largely takes care of that. In fact, when the legal market was in a big downturn around 2008, some firms were trying kind of almost a Canadian-style apprenticeship, and billables were much lower for those people. The district judge, though, takes the view that this really, when all is said and done, the economic reality of this is that it's training, and the judge raises the question, for example, Judge Tharp is over on page 28. What would tuition have been in the absence of whatever profits Regency derived from the operation of the employment floor? That it's all just an interrelated training phase. And yes, are they cleaning the bathrooms? I get that. But maybe they're learning how to juggle all of the business realities of running a salon. So what do you say to his comment about the interrelation between tuition and the work they're doing? There's certainly no question that there's an interrelation, and it's an ecosystem, right? Because you've got the business. You've got economic incentives. You've got state law and regulation. You've got federal law. You know, to come at it from another way, there are many examples of essentially workers in training who are paid by custom. Medical residence is one of them. Nursing residence is another. And certainly you could say, well, okay, maybe their tuition for the classroom portion is higher. The medical residents don't think they're paid enough, I'm going to tell you. Well, but medical students in clinical rotations before they get their degree are not paid, are they? No. Right. But the medical residents are. But, I mean, to answer the question, you know, one possibility is that tuition could go up. I think that's probably fairly likely. There's another possibility that the regulatory structure could just react. It could put more focus on classroom activities or even. And who would benefit from those changes? Well, certainly the students would benefit. That's not at all clear, is it? I mean, look, if we take your brief's argument that we assume reasonable economic efficiency in these markets, if you take away one source of revenue for regency, it's going to make it up, right? It's not at all clear to me that cutting back on hours of clinical experience or salon experience, whatever the case may be, is going to improve things for the public or for the profession. Well, I think this just goes to the reason that Congress structured the FLSA the way it did, which is under Section 14 of the Fair Labor Standards Act, it said employees who are employed as learners and apprentices, that the enterprise essentially can go to the Department of Labor and get a subminimum wage certificate. Right. Reconcile that approach, which can sweep pretty broadly, but reconcile that approach with the Portland Terminal opinion by, as it happened, one of the sponsors of the FLSA, a coincidence we don't often see in federal law, but where the opinion quite clearly implies that students in vocational schools like this are not employees. Sure. Well, I think when you're looking at that analogy in Portland Terminal, you've got to take account of the facts of Portland Terminal. I'm not talking about the specific facts of the case. I'm talking about the reasoning in the case that used the situation of those trainee brakemen and compared them to students in vocational schools. Yeah. Well, it's a valid argument there, and I think the argument was made in service of the ultimate point, that there was no immediate benefit to the employer in that case. You have a one-week program. It starts with observation. It leads to some hands-on work, but not in a way that provided any benefit whatsoever. In fact, the finding in that case was it impeded the operation of the business. And in that case, there's a direct analogy to sort of the classroom workshop phase of vocational training. And so as we point out in our brief, the analogy here is when the cosmetology students begin, they start with classroom training, and then they begin by doing hands-on work with each other, not for pay, not for the public, and that's really the analogy to Portland Terminal. And so when Portland Terminal says, well, this thing that was essentially valueless to the enterprise could have happened in a school, that's what they were talking about. By contrast here, you've got the next step, the performance phase, where the students are really going out into an environment that looks and sounds and operates just like the real-world market with some minimal supervision. They are cutting hair and cleaning bathrooms and so forth. And so the question really that's relevant insofar as Portland Terminal is concerned is, suppose the railroad would have taken it a step further and said, the next step is you're going to do a one-year training program and we're going to classify you as non-employees during that year. I think that would have been a very different question. I see that my light is on. I will reserve the balance of my time. Okay. You have used it up, and I will probably give you a minute to rebut. Mr. Alamudin. Good morning. May it please the Court, my name is Sari Alamudin. With me is co-counsel Chris Bourne, and we represent the FLEs in this case. I think I'd like to start with the point that the Court was making, which is you have to look at the economic reality of the relationship rather than focusing on an isolated factor, which appears to be the main thrust of my opponent's argument, which is that the school was deriving revenue. So let me ask this. I mean, it's clearly a big part of this program to have the performance salon, if you will, the performance. And so the question is, is Regency essentially operating a hair salon with a little bit of education on the side, but mostly running something like Great Clips or whatever discount hair place there is? Or is it really a school? Because if it's really running a hair salon with a little bit of window dressing on the side of some classes, then you would think the Fair Labor Standards Act ought to apply, even though people are paying some tuition for the classroom time. Well, I think the answer to that is that the state law regulations require the school, Regency, to have a clinic, to have a practical aspect of the educational training. And what's important here is that the curriculum matches the regulations no more, no less. So, for example, if you were thinking that the school were really operating as a salon, you would expect that the classroom training portion of it would be at the minimum of 150 hours, as opposed to more than double what the state requires, 320 hours, before you get into the rehearsal and performance phase. You would expect, perhaps, that the curriculum would go more than the 1,500 hours total required by the state. For example, if there was another extra 500 hours so that the school could operate as a clinic, then that would be a different set of facts than what we have here. But the other thing that I would say is the practical stuff that they were teaching in this clinic is stuff that was required by the state and that Hollins herself testified was very useful for her when it came to actually operating as a salon. And the school is prohibited from employing licensed cosmetologists in its clinic. So it has the supervisors, though. There's a supervisor for 20 or 22, something along those lines. Yes, but their supervisor's sole responsibility is to supervise the students in the clinical activities, to consult with them beforehand, to check in with them during the service of the guests if there are any questions, and then to provide constructive criticism afterwards. They are not doing any services on the guests themselves. They can't under law because licensed cosmetologists cannot practice in a school. So if you go back to the entirety of the relationship, the economic reality, if you had the school not charging guests for services, would anything change? No, you would still have the clinic. You would still have a practical phase of the education. The only difference would be where would that revenue be coming from. And as Justice Hamilton suggested, I don't think it's to the benefit of Ms. Hollins that the revenue comes from tuition, for example, a tuition hike, as opposed to paying customers. And by the way, Ms. Hollins also testified that working on paying customers was more realistic because if you were paying for something, they expected service. So let me ask you this. Is there anything detrimental, I guess? Is this one of those things where Regency is running this operation, but a little bit like the Portland Terminal case, having these neophytes do the haircuts may not be 100% beneficial anyway. That was kind of the argument that was made in the Portland Terminal case. Well, I think the big difference between Portland Terminal and here on the facts is that there was a labor pool that was designed for Portland Terminal then to hire those individuals once the training was completed. Here there is no expectation. In fact, Regency does not hire any of its students following graduation. They go and work someplace else. Now, do they take an exam? Yes. They take an exam. It's not administered by Regency. Correct. It's administered by the state. Correct. Exactly. And everything that is on the exam is part of the curriculum. And so, for example, sanitation or the merchandising, dealing with customers, all of that is part of the exam. So what the school is trying to do is give as real life an experience as possible. And does it correspond to the academic semester, or is it independent of that? Well, what it is is the regulations say they have to be 1,500 hours, and that's exactly what they do. Now, when you say corresponding with the academic semester, I want to make sure I understand. Well, it's one of the factors. Sometimes, you know, is this clinical training or on-the-job training or whatever you want to call it, something that happens according to whatever terms of instruction Regency uses? I assume the in-class offerings take place over some number of weeks or some period. Correct. And then you switch to the performance rehearsal phase where you go back and forth between them. But there's a particular number of weeks that somebody does that in? There is. Now, they have to get to the 1,500 hours, so if they don't get it within the prescribed period of time, they have to extend their program period. Mr. Alamudin, I assume your law firm pays the students you hire for the summer, right? We do, Your Honor. Okay. So let me ask you a hypothetical. It's a different situation, which does happen, where law students who may not have opportunities to work at a place like your firm might volunteer at a private firm to learn what they can, but they don't get academic credit, but they do work that helps out those lawyers. Is that a problem under the FLSA? It might be, Your Honor, because you just said they don't get academic credit. So if you're looking at who benefits from that relationship in that situation, if they're not getting anything out of it, that might be a different issue. Here, of course, Ms. Holland's got academic credit for every minute she was on the performance floor. So it's a different situation than the hypothetical that you suggest, in my view. Externs would be in the legal profession. For instance, we hire externs. Not hire. We have externs. We allow them to come. We don't pay them.  Are they analogous to the here people? I think so, Your Honor, because, again, it's part of the learning experience, if you will. They're getting credit, whether they're satisfying a graduation requirement or there's some other fashion they're getting credit for it, and they're learning, and they're doing it voluntarily and with no expectation that you're going to be employed at this particular or with the court, in your example. I'd also like to sort of address the argument that counsel made with respect to the Section 14 of the FLSA and the origins of the statute. I think the fact that Congress contemplated that in some instances learners and apprentices could be paid in employment only sort of begs the question. The question is, of course, whether they're employed or not in the first instance. So I think the Supreme Court in Portland Terminal got it right, by pointing out the limitations to that argument 70 years ago and specifically giving vocational schools as an example of the point. Right. I mean, this is an issue that is arising in quite a few guises, whether it's the difference between medical students on their rotations and residents, or whether it's other people who are in some sort of training program. At some point you cross the line, and you're not being trained anymore. You are in some beginner's job classification, whatever you may want to call it. I can imagine vocational schools probably have much the same issue. I'm speaking of maybe the trade, such as plumbing or carpentry or electricians or whatever. On the job, actual doing things is bound to be an important part of education. So there's actually a lot hanging here in terms of how long you can get this free work out of people and at what point you've got to switch over to the Fair Labor Standards Act standard. I would agree, Your Honor. But I think to the extent that there is a line where one becomes the other, I think we fall very clearly on one side of the line where there are students. Again, I go back to... The record does show how much money. Wasn't there some back and forth, how much you were netting, how much you were grossing? Correct. So the record shows the revenue that the school was deriving from these clinics, but there was also undisputed testimony from the chief executive officer that the costs of operating the clinic more than offset the revenue. So to the extent that there's a difference between revenue and profit, obviously. And the other point with respect to immediate advantage, even if one were to conclude that the school was getting immediate advantage from this revenue because that revenue was being used to offset costs, the fact of the matter is that a number of appellate courts have concluded that immediate advantage is not determinative and nothing in Portland Terminal suggested that it would be. It's an entirely different fact context, a one-week training program, than the modern day programs that we see here for vocational schools and so forth. Unless the court has any further questions, I thank you for your time. Thank you very much. And I said I would give you one final minute, Mr. Hanson. I'll just conclude with one comment. I certainly agree with your point, Chief Judge Wood, about where to draw the line. That is the consideration, and you're seeing this more and more, especially with more and more jobs being regulated through occupational licensing regimes. By some measures, it's up to 25 percent of all occupations now. And I would just close by submitting that this was the concern that Congress was trying to get at with Section 14 of the Fair Labor Standards Act. Rather than having courts come up with all these 200-factor tests and you're an employee but you're not and you have to get paid and you don't, it was very simple, cast the net broad, broadest definition of employment in any one act, and all you have to do, it's a very minimum administrative burden, come to the Department of Labor and say, look, in this industry, in this circumstance, it doesn't make sense to pay these people for this period of time, and the Department of Labor can grant them that. That's the structure that Congress set up, and we ask the court to adhere to it here. I thank the court for its time. Thank you. Thanks to both counsel. We'll take the case under advisement.